# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

United States Courts
Southern District of Texas
FILED

MAY 1 4 2014

David J. Bradley, Clerk of Court

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | § | |
| | § | |
| **v.** | § | **Criminal No.  H-14-171S** |
| | § | |
| **DAVID EDSON** | § | |
| **JEFFERY PARSONS** | § | |
| **ARETHA JOHNSON** | § | |
| **EARNESTINE JOHNSON** | § | |
| **INGER MICHELLE PACE** | § | |
| **JAMES BOBINO** | § | |
| **JACQUELINE HARRIS** | § | |
| **VERMON LACY III** | § | |
| **RONALD TURNER** | § | |
| **MARY BROWNING** | § | |
| **CHERYL WALLER** | § | |
| **DEBORAH DAVIS** | § | |
| **Defendants** | § | |

## SUPERSEDING INDICTMENT

THE GRAND JURY CHARGES:

## COUNT 1
### Conspiracy to Defraud the United States
### and to Pay and Receive Kickbacks
### (18 U.S.C. § 371)

### A.  Introduction

At all times material to this Superseding Indictment, unless otherwise

specified:

1.      The Medicare Program ("Medicare") was a federal healthcare program providing benefits to individuals who were over the age of 65 or disabled. Medicare was administered by the Centers for Medicare and Medicaid Services ("CMS"), a federal agency under the United States Department of Health and Human Services.  Medicare was a "healthcare benefit program" as defined by Title 18, United States Code, Section 24(b).

2.      Medicare was subdivided into multiple Parts.  Medicare Part B covered partial hospitalization programs ("PHPs") connected with the treatment of mental illness.  The treatment program of PHPs closely resembled that of a highly structured, short-term hospital inpatient program, but it was a distinct and organized intensive treatment program that offered less than 24-hour daily care.

3.      Patients eligible for Medicare coverage of a PHP comprised two groups:  (1) those patients who were discharged from an inpatient hospital treatment program, and the PHP is in lieu of continued inpatient treatment and (2) those patients who, in the absence of partial hospitalization, would require inpatient hospitalization.

4.     Medicare guidelines required that patients admitted to a PHP required PHP services at levels of intensity and frequency comparable to patients in an inpatient setting for similar psychiatric illnesses.

5.     Under the PHP benefit, Medicare covered the following services:  (1) individual and group psychotherapy with physicians, psychologists or other mental health professionals; (2) occupational therapy requiring the skills of a qualified occupational therapist; (3) services of social workers, trained psychiatric nurses and other staff trained to work with psychiatric patients; (4) drugs and biologicals furnished for therapeutic purposes that could not be self-administered; (5) individualized activity therapies that were not primarily recreational or diversionary; (6) family counseling services for which the primary purpose is the treatment of the patient's condition; (7) patient education programs where the educational activities were closely related to the care and treatment of the patient; and (8) diagnostic services.

6.     Medicare guidelines specifically excluded meals and transportation from coverage under the PHP benefit.

7.     Medicare did not cover programs providing primarily social, recreational or diversionary activities.  Medicare excluded from coverage programs

3

attempting to maintain psychiatric wellness and treatment of chronic conditions without acute exacerbation. Psychosocial programs that provided only a structured environment, socialization or vocational rehabilitation were not covered by Medicare.

8.     Medicare required that the PHP was provided at a facility that was hospital based or hospital affiliated or at a community mental health center (CMHC).

9.     Individuals who qualified for Medicare benefits were commonly referred to as Medicare "beneficiaries." Each beneficiary was given a Medicare identification number.

10.     Hospitals, physicians and other healthcare providers that provided services to Medicare beneficiaries were referred to as Medicare "providers." To participate in Medicare, providers were required to submit an application in which the providers agreed to comply with all Medicare related laws and regulations. If Medicare approved a provider's application, Medicare assigned the provider a Medicare "provider number." A healthcare provider with a Medicare provider number could file claims with Medicare to obtain reimbursement for services rendered to beneficiaries.

11.     Medicare paid CMHCs, hospitals and other healthcare providers for services rendered to beneficiaries.  To receive payment from Medicare, providers submitted or caused the submission of claims to Medicare, either directly or through a billing company.

12.     CMS contracted with Medicare Administrative Contractors ("MACs") to process claims for payment.  The MAC that processed and paid Medicare Part B claims for PHP services in Texas was TrailBlazer Health Enterprises, LLC ("TrailBlazer").

13.     To bill Medicare for services rendered, a provider submitted a claim form (Form 1500) to TrailBlazer.  When a Form 1500 was submitted, usually in electronic form, the provider certified that:  (1) the contents of the form were true, correct and complete; (2) the form was prepared in compliance with the laws and regulations governing Medicare; and (3) the contents of the claim were medically necessary.

14.     A Medicare claim for PHP reimbursement was required to set forth, among other things, the beneficiary's name and unique Medicare identification number, the item or service provided to the beneficiary, the date the item or service was provided, the cost of the item or service and the name and unique physician

identification number of the physician who prescribed or ordered the item or service.

15.     The Medicaid program is a state-administered health insurance program funded by the United States Government and by the State of Texas. The Medicaid program helps pay for reasonable and necessary medical procedures and services provided to individuals who are deemed eligible under state low-income programs. The Texas Medicaid program is a cooperative federal-state program to furnish medical assistance to the indigent. The State of Texas contracts with Texas Medicaid & Healthcare Partnership (hereinafter referred to as TMHP) to process and pay claims submitted by health care providers.

16.     Continuum Healthcare, LLC (Continuum) owned and operated three Community Mental Health Centers (CMHC) in the Greater Houston Area.

17.     Continuum Hornwood, LLC (Hornwood) operated a CMHC located at 6614 Hornwood, Houston, Texas. Hornwood billed Medicare for PHP services that were not medically necessary, and, in some cases, not provided.

18.     Continuum Baytown CMHC, LLC (Baytown) operated a CMHC located at 2001 Cedar Bayou, Baytown, Texas.  Baytown billed Medicare for PHP services that were not medically necessary, and, in some cases, not provided.

19.    Continuum Missouri City (Missouri City) operated as an outpatient center for Westbury Community Hospital located at FM 1092, Missouri City, Texas.  Westbury billed Medicare for PHP services at Missouri City that were not medically necessary, and, in some cases, not provided.

20.    Westbury Community Hospital, LLC (Westbury) operated a Partial Hospitalization Program (PHP) located at 5556 Gasmer, Houston, Texas. Westbury billed Medicare for PHP services that were not medically necessary, and, in some cases, not provided.

21.    My Fellow Man Alliance ("MFMA") was formed as a 501(c)(3) tax-exempt corporation, located at 6060 Richmond Avenue, Houston, Texas, to take over Continuum's "bed lease program."  MFMA was funded almost exclusively by Continuum Healthcare LLC.

22.    Defendant **DAVID EDSON,** a resident of Palm Harbor, Florida, was the Vice President of Development for Continuum Healthcare, Inc.

23.    Defendant **JEFFERY PARSONS**, a resident of Crockett, Texas, was the Vice President of Operations for Continuum Healthcare, Inc.

24.    Defendant **ARETHA JOHNSON**, a resident of Sweeny, Texas, was the owner/operator of Liberty Island Adult Day Care (Liberty Island).

7

25.     Defendant **EARNESTINE JOHNSON**, a resident of Houston, Texas, was a patient advocate for Continuum.

26.     Defendant **INGER MICHELLE PACE**, a resident of Missouri City, Texas, was a Personal Care Home (PCH) owner and a patient advocate for Continuum.

27.     Defendant **JAMES BOBINO**, a resident of Houston, Texas, was a PCH owner and a patient advocate for Continuum.

28.     Defendant **JACQUELINE HARRIS**, a resident of Cypress, Texas, was a patient advocate for Continuum.

29.     Defendant **VERMON LACY III**, a resident of Katy, Texas, was a patient advocate for Continuum.

30.     Defendant **RONALD TURNER**, a resident of Fresno, Texas, was a patient advocate for Continuum.

31.     Defendant **MARY BROWNING**, a resident of Missouri City, Texas, was a PCH owner and a patient advocate for Continuum.

32.     Defendant **CHERYL WALLER**, a resident of Houston, Texas, was a PCH owner and a patient advocate for Continuum.

33.     Defendant **DEBORAH DAVIS**, a resident of Atlanta, Georgia, was a

PCH owner and a patient advocate for Continuum.

## B. The Conspiracy

34.     From in or around March 2005, through April 2012, the exact dates

being unknown to the Grand Jury, in the Houston Division of the Southern District

of Texas, and elsewhere, the defendants,

**DAVID EDSON,**
**JEFFERY PARSONS,**
**ARETHA JOHNSON,**
**EARNESTINE JOHNSON,**
**INGER MICHELLE PACE,**
**JAMES BOBINO,**
**JACQUELINE HARRIS,**
**VERMON LACY III,**
**RONALD TURNER,**
**MARY BROWNING,**
**CHERYL WALLER and**
**DEBORAH DAVIS,**

did knowingly and willfully combine, conspire, confederate and agree with others

known and unknown to the grand jury, to commit certain offenses against the

United States, that is,

a.     to defraud the United States by impairing, impeding,

obstructing and defeating through deceitful and dishonest

means, the lawful government functions of the United States Department of Health and Human Services in its administration and oversight of the Medicare program;

b.    to violate Title 42, United States Code, Section 1320a-7b(b)(1), by knowingly and willfully soliciting and receiving remuneration, specifically, kickbacks and bribes, directly and indirectly, overtly and covertly, in return for referring individuals for the furnishing and arranging for the furnishing of any item and service for which payment may be made in whole or in part by Medicare; and for the purchasing, leasing, ordering and arranging for and recommending the purchasing, leasing and ordering of any good, item and service for which payment may be made in whole and in part by a Federal health care program, that is, Medicare; and

c.    to violate Title 42, United States Code, Section 1320a-7b(b)(2), by knowingly and willfully offering and paying remuneration, specifically, kickbacks and bribes, directly and indirectly, overtly and covertly, in return for referring individuals for the

furnishing and arranging for the furnishing of any item and service for which payment may be made in whole or in part by Medicare; and for the purchasing, leasing, ordering and arranging for and recommending the purchasing, leasing and ordering of any good, item and service for which payment may be made in whole and in part by a Federal health care program, that is, Medicare.

### C.  Purpose of the Conspiracy

35.    It was the purpose of the conspiracy for the defendants to unlawfully enrich themselves by paying and receiving kickbacks and bribes in exchange for the referral of Medicare beneficiaries for whom Continuum and Westbury would submit claims to Medicare.

### D.  Manner and Means of The Conspiracy

It was a part of the conspiracy that:

36.  Defendants DAVID EDSON and JEFFERY PARSONS would and did cause Continuum/Westbury to issue checks to patient advocates and personal care home owners in exchange for the referral of Medicare beneficiaries by those

patient advocates and personal care home owners to the Continuum/Westbury PHP programs.

37. Defendants DAVID EDSON and JEFFERY PARSONS would and did cause Continuum to issue checks to personal care home owners for "bed leases" in exchange for the referral of Medicare beneficiaries by those personal care home owners to the Continuum PHP programs.

38. Defendant DAVID EDSON would and did incorporate My Fellow Man Alliance ("MFMA") as a 501(c)(3) tax-exempt corporation to take over Continuum's "bed lease program."

39. Defendants DAVID EDSON and JEFFERY PARSONS would and did cause MFMA to issue checks to personal care home owners for bed leases in exchange for the referral of Medicare beneficiaries by those personal care home owners to the Continuum PHP programs.

40. Defendant ARETHA JOHNSON would and did receive approximately $2.6 million from Continuum/Westbury in exchange for referring her clients for PHP services at Continuum/Westbury.

41. Defendants DAVID EDSON and JEFFERY PARSONS would and did cause Continuum/Westbury to bill Medicare approximately $12.2 million for PHP

services allegedly needed by, and provided to, the clients referred by defendant ARETHA JOHNSON.

42. Defendants DAVID EDSON and JEFFERY PARSONS would and did cause Medicare to pay approximately $4.7 million to Continuum/Westbury for PHP services allegedly needed by, and provided to, the clients referred by defendant ARETHA JOHNSON.

43. Defendant EARNESTINE JOHNSON would and did receive approximately $465,000.00 from Continuum/Westbury in exchange for referring her clients for PHP services at Continuum/Westbury.

44. Defendants DAVID EDSON and JEFFERY PARSONS would and did cause Continuum/Westbury to bill Medicare approximately $7.2 million for PHP services allegedly needed by, and provided to, the clients referred by defendant EARNESTINE JOHNSON.

45. Defendants DAVID EDSON and JEFFERY PARSONS would and did cause Medicare to pay approximately $2.8 million to Continuum/Westbury for PHP services allegedly needed by, and provided to, the clients referred by defendant EARNESTINE JOHNSON.

46.    Defendant INGER MICHELLE PACE would and did receive approximately $447,000.00 from Continuum/Westbury in exchange for referring her clients for PHP services at Continuum/Westbury.

47.  Defendants DAVID EDSON and JEFFERY PARSONS would and did cause Continuum/Westbury to bill Medicare approximately $5.5 million for PHP services allegedly needed by, and provided to, the clients referred by defendant INGER MICHELLE PACE.

48.  Defendants DAVID EDSON and JEFFERY PARSONS would and did cause Medicare to pay approximately $2 million to Continuum/Westbury for PHP services allegedly needed by, and provided to, the clients referred by defendant INGER MICHELLE PACE.

49.    Defendant JAMES BOBINO would and did receive approximately $372,000.00 from Continuum/Westbury in exchange for referring his clients for PHP services at Continuum/Westbury.

50.  Defendants DAVID EDSON and JEFFERY PARSONS would and did cause Continuum/Westbury to bill Medicare approximately $4.5 million for PHP services allegedly needed by, and provided to, the clients referred by defendant JAMES BOBINO.

51. Defendants DAVID EDSON and JEFFERY PARSONS would and did cause Medicare to pay approximately $1.6 million to Continuum/Westbury for PHP services allegedly needed by, and provided to, the clients referred by defendant JAMES BOBINO.

52. Defendant JACQUELINE HARRIS would and did receive approximately $438,000.00 from Continuum/Westbury in exchange for referring her clients for PHP services at Continuum/Westbury.

53. Defendants DAVID EDSON and JEFFERY PARSONS would and did cause Continuum/Westbury to bill Medicare approximately $3.9 million for PHP services allegedly needed by, and provided to, the clients referred by defendant JACQUELINE HARRIS.

54. Defendants DAVID EDSON and JEFFERY PARSONS would and did cause Medicare to pay approximately $1.4 million to Continuum/Westbury for PHP services allegedly needed by, and provided to, the clients referred by defendant JACQUELINE HARRIS.

55. Defendant VERMON LACY III would and did receive approximately $295,000.00 from Continuum/Westbury in exchange for referring his clients for PHP services at Continuum/Westbury.

56. Defendants DAVID EDSON and JEFFERY PARSONS would and did cause Continuum/Westbury to bill Medicare approximately $2.5 million for PHP services allegedly needed by, and provided to, the clients referred by defendant VERMON LACY III.

57. Defendants DAVID EDSON and JEFFERY PARSONS would and did cause Medicare to pay approximately $888,000.00 to Continuum/Westbury for PHP services allegedly needed by, and provided to, the clients referred by defendant VERMON LACY III.

58. Defendant RONALD TURNER would and did receive approximately $250,000.00 from Continuum/Westbury in exchange for referring his clients for PHP services at Continuum/Westbury.

59. Defendants DAVID EDSON and JEFFERY PARSONS would and did cause Continuum/Westbury to bill Medicare approximately $9.8 million for PHP services allegedly needed by, and provided to, the clients referred by defendant RONALD TURNER.

60. Defendants DAVID EDSON and JEFFERY PARSONS would and did cause Medicare to pay approximately $3.5 million to Continuum/Westbury for

PHP services allegedly needed by, and provided to, the clients referred by defendant RONALD TURNER.

61.   Defendant   MARY   BROWNING   would   and   did   receive approximately $138,000.00 from Continuum/Westbury in exchange for referring her clients for PHP services at Continuum/Westbury.

62.   Defendants DAVID EDSON and JEFFERY PARSONS would and did cause Continuum/Westbury to bill Medicare approximately $7.2 million for PHP services allegedly needed by, and provided to, the clients referred by defendant MARY BROWNING.

63.   Defendants DAVID EDSON and JEFFERY PARSONS would and did cause Medicare to pay approximately $2.7 million to Continuum/Westbury for PHP services allegedly needed by, and provided to, the clients referred by defendant MARY BROWNING.

64.   Defendant CHERYL WALLER would and did receive approximately $118,000.00 from Continuum/Westbury in exchange for referring her clients for PHP services at Continuum/Westbury.

65.   Defendants DAVID EDSON and JEFFERY PARSONS would and did cause Continuum/Westbury to bill Medicare approximately $4.7 million for PHP

services allegedly needed by, and provided to, the clients referred by defendant CHERYL WALLER.

66. Defendants DAVID EDSON and JEFFERY PARSONS would and did cause Medicare to pay approximately $1.7 million to Continuum/Westbury for PHP services allegedly needed by, and provided to, the clients referred by defendant CHERYL WALLER.

67. Defendant DEBORAH DAVIS would and did receive approximately $155,000.00 from Continuum/Westbury in exchange for referring her clients for PHP services at Continuum/Westbury.

68. Defendants DAVID EDSON and JEFFERY PARSONS would and did cause Continuum/Westbury to bill Medicare approximately $ 4.3 million for PHP services allegedly needed by, and provided to, the clients referred by defendant DEBORAH DAVIS.

69. Defendants DAVID EDSON and JEFFERY PARSONS would and did cause Medicare to pay approximately $1.6 million to Continuum/Westbury for PHP services allegedly needed by, and provided to, the clients referred by defendant DEBORAH DAVIS.

70. Defendants DAVID EDSON and JEFFERY PARSONS would and did become authorized signatories for Westbury Community Hospital account *7372 at Wallace State Bank on February 3, 2012.

71. Defendants DAVID EDSON and JEFFERY PARSONS would and did cause Continuum/Westbury to bill Medicare approximately $199 million in total for PHP services allegedly provided to clients referred by patient advocates.

72. Defendants DAVID EDSON and JEFFERY PARSONS would and did cause Medicare to pay approximately $72 million in total to Continuum/Westbury for PHP services allegedly provided to clients referred by patient advocates.

73. Defendants DAVID EDSON and JEFFERY PARSONS would and did cause Medicaid to pay approximately $3.4 million in total to Continuum/Westbury for PHP services allegedly provided to clients referred by patient advocates.

### E. Overt Acts

74. In furtherance of the conspiracy, and to accomplish its object and purpose, the conspirators committed and caused to be committed, in the Houston Division of the Southern District of Texas, the following overt acts:

    a.    On or about May 18, 2009, defendants EDSON and PARSONS caused the payment of approximately $12,400.00 to defendant

ARETHA JOHNSON in exchange for JOHNSON referring Medicare beneficiaries to Continuum for PHP services.

b.    On or about May 29, 2009, defendants EDSON and PARSONS caused the payment of approximately $3,094.00 to defendant EARNESTINE JOHNSON in exchange for JOHNSON referring Medicare beneficiaries to Continuum for PHP services.

c. On or about October 27, 2010, defendants EDSON and PARSONS caused the payment of approximately $6,000.00 to defendant INGER MICHELLE PACE in exchange for PACE referring Medicare beneficiaries to Continuum for PHP services.

d. On or about July 10, 2009, defendants EDSON and PARSONS caused the payment of approximately $3,245.00 to defendant JAMES BOBINO in exchange for BOBINO referring Medicare beneficiaries to Continuum for PHP services.

e. On or about May 15, 2009, defendants EDSON and PARSONS caused the payment of approximately $2,903.00 to defendant JACQUELINE HARRIS in exchange for HARRIS referring Medicare beneficiaries to Continuum for PHP services.

20

f. On or about November 27, 2009, defendants EDSON and PARSONS caused the payment of approximately $2,355.00 to RONALD TURNER in exchange for TURNER referring Medicare beneficiaries to Continuum for PHP services.

g. On or about October 2, 2009, defendants EDSON and PARSONS caused the payment of approximately $1,986.00 to defendant MARY BROWNING in exchange for BROWNING referring Medicare beneficiaries to Continuum for PHP services.

h. On or about June 11, 2010, defendants EDSON and PARSONS caused the payment of approximately $2,044.00 to defendant CHERYL WALLER in exchange for WALLER referring Medicare beneficiaries to Continuum for PHP services.

i. On or about October 16, 2009, defendants EDSON and PARSONS caused the payment of approximately $2,308.00 to defendant DEBORAH DAVIS in exchange for DAVIS referring Medicare beneficiaries to Continuum for PHP services.

j. On or about January 8, 2010, defendants EDSON and PARSONS caused the payment of approximately $2,760.00 to defendant VERMON

21

LACY III in exchange for LACY referring Medicare beneficiaries to Continuum for PHP services.

All in violation of Title 18, United States Code, Section 371.

## COUNTS TWO THROUGH ELEVEN
### Payment and Receipt of Healthcare Kickbacks
### (42 U.S.C. §§ 1320a-7b(b)(1) & (b)(2) and 18 U.S.C. § 2)

1.      Paragraphs 1 through 33 and 36 through 74 of the Indictment are realleged and incorporated by reference as if fully set forth herein.

2.      On or about the dates enumerated below, in the Houston Division of the Southern District of Texas and elsewhere, the defendants as set forth below, aiding and abetting each other and others known and unknown to the Grand Jury, did knowingly and willfully offer and pay remuneration, specifically, kickbacks and bribes, directly and indirectly, overtly and covertly, in exchange for referring individuals for the furnishing and arranging for the furnishing of any item and service for which payment may be made in whole or in part by Medicare and by knowingly and willfully soliciting and receiving remuneration, specifically, kickbacks and bribes, directly and indirectly, overtly and covertly, in return for referring individuals for the furnishing and arranging for the furnishing of any item and service for which payment may be made in whole or in part by Medicare:

| CT | DEFENDANT(S) | DATE | APPROXIMATE PAYMENT |
|---|---|---|---|
| 2 | David Edson<br>Jeffery Parsons<br>Aretha Johnson | 5/18/2009 | $12,400.00 |
| 3 | David Edson<br>Jeffery Parsons<br>Earnestine Johnson | 5/29/2009 | $3,094.00 |
| 4 | David Edson<br>Jeffery Parsons<br>Inger Michelle Pace | 10/27/2010 | $6,000.00 |
| 5 | David Edson<br>Jeffery Parsons<br>James Bobino | 7/10/2009 | $3,245.00 |
| 6 | David Edson<br>Jeffery Parsons<br>Jacqueline Harris | 5/15/2009 | $2,903.00 |
| 7 | David Edson<br>Jeffery Parsons<br>Ronald Turner | 11/27/2009 | $2,355.00 |
| 8 | David Edson<br>Jeffery Parsons<br>Mary Browning | 10/2/2009 | $1,986.00 |
| 9 | David Edson<br>Jeffery Parsons<br>Cheryl Waller | 6/11/2010 | $2,044.00 |
| 10 | David  Edson<br>Jeffery Parsons<br>Deborah Davis | 10/16/2009 | $2,308.00 |

| 11 | David Edson<br>Jeffery Parsons<br>Vermon Lacy, III | 1/8/2010 | $2,760.00 |
|----|-----|-----|-----|

In violation of 42 U.S.C. §§ 1320a-7b(b)(1) & (b)(2) and 18 U.S.C. § 2

## COUNTS TWELVE THROUGH FOURTEEN
### (Engaging in Monetary Transactions in Property Derived from Specified Unlawful Activity - 18 U.S.C. § 1957)

1.      On or about the dates set forth below, in the Houston Division of the

Southern District of Texas and elsewhere, the defendants

**DAVID EDSON,**
**JEFFERY PARSONS**
**and**
**ARETHA JOHNSON,**

aided and abetted by others, known and unknown, did knowingly engage and

attempt to engage in monetary transactions by, through, or to a financial institution,

affecting interstate or foreign commerce, in criminally derived property of a value

greater than $10,000, such property having been derived from a specified unlawful

activity, that is health care fraud in violation of Title 18, United States Code,

Section 1347, as follows:

| COUNT | DEFENDANTS | DATE | MONETARY TRANSACTION |
|---|---|---|---|
| 12 | David Edson Jeffery Parson Aretha Johnson | 5/4/2010 | Deposit of Check # 12240 drawn on Continuum Hornwood, LLC, Regions Bank account *4430, in the amount of $11,106.00, payable to Aretha Johnson DBA Liberty Island Properties into Liberty Island Adult Day Care account *1190 at JP Morgan Chase Bank |
| 13 | David Edson Jeffery Parsons Aretha Johnson | 1/11/11 | Deposit of Check # 12573 drawn on Continuum Hornwood, LLC, Regions Bank account *4430, in the amount of $12,000.00, payable to Aretha Johnson DBA Liberty Island Properties into Liberty Island Adult Day Care account *1125 at JP Morgan Chase Bank |
| 14 | David Edson Jeffery Parsons | 3/3/12 | Transfer from Westbury Community Hospital, LLC Wallace State Bank account *7372, in the amount of $17,050.00, to Westbury Community Hospital, LLC Wallace State Bank account *3393 |

In violation of Title 18, United States Code, Section 1957 and 2.

## NOTICE OF FORFEITURE
### (18 U.S.C. § 982(a)(7))

Pursuant to Title 18, United States Code, Section 982(a)(7), as a result of the criminal offenses charged in Counts 1 through 11 of this Indictment, the United States of America gives the defendants,

**DAVID EDSON,**
**JEFFERY PARSONS,**
**ARETHA JOHNSON,**
**EARNESTINE JOHNSON,**
**INGER MICHELLE PACE,**
**JAMES BOBINO,**
**JACQUELINE HARRIS,**
**VERMON LACY III,**
**RONALD TURNER,**
**MARY BROWNING,**
**CHERYL WALLER and**
**DEBORAH DAVIS,**

notice that, upon their conviction, all property, real or personal, which constitutes

or is derived, directly or indirectly, from gross proceeds traceable to such offenses,

is subject to forfeiture.

## NOTICE OF FORFEITURE
### (28 U.S.C. § 2461(c); 18 U.S.C. § 981(a)(1)(C))

Pursuant to Title 28, United States Code, Section 2461(c) and Title 18,

United States Code, Section 981(a)(1)(C), as a result of the criminal offenses

charged in Counts 1 through 11 of this Indictment, the United States of America

gives the defendants,

**DAVID EDSON,**
**JEFFERY PARSONS,**
**ARETHA JOHNSON,**
**EARNESTINE JOHNSON,**
**INGER MICHELLE PACE,**
**JAMES BOBINO,**

26

**JACQUELINE HARRIS,**
**VERMON LACY III,**
**RONALD TURNER,**
**MARY BROWNING,**
**CHERYL WALLER and**
**DEBORAH DAVIS,**

notice that, upon their conviction, all property, real or personal, which constitutes

or is derived from proceeds traceable to such offenses, is subject to forfeiture.

## NOTICE OF FORFEITURE
### (18 U.S.C. § 982(a)(1))

Pursuant to Title 18, United States Code, Section 982(a)(1), as a result of the

criminal offenses charged in Counts 12 through 14 of this Indictment, the United

States of America gives the defendants,

**DAVID EDSON,**
**JEFFERY PARSONS**
**and**
**ARETHA JOHNSON,**

notice that, upon their conviction, all property, real or personal, involved in money

laundering offenses or traceable to such property, is subject to forfeiture.

## Money Judgment

All defendants are further notified that upon conviction, a money judgment

may be imposed equal to the total value of the property subject to forfeiture, for

which the defendants may be jointly and severally liable.

## **Substitute Assets**

All defendants are notified that in the event that property subject to forfeiture, as a result of any act or omission of a defendant,

(A) cannot be located upon the exercise of due diligence;

(B) has been transferred or sold to, or deposited with, a third party;

(C) has been placed beyond the jurisdiction of the court;

(D) has been substantially diminished in value; or

(E) has been commingled with other property that cannot be divided without difficulty,

the United States will seek to forfeit any other property of the defendants up to the total value of the property subject to forfeiture, pursuant to Title 21, United States Code, Section 853(p), incorporated by reference in Title 18, United States Code, Section 982(b)(1) and Title 28, United States Code, Section 2461(c).

A TRUE BILL
Original signature on File

FOREPERSON

KENNETH MAGIDSON
UNITED STATES ATTORNEY

Albert A. Balboni
Assistant United States Attorney